IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| DEWEY FRANKLIN HARDMAN | ) | Case No.  10-20359 |
| LORI LYNN HARDMAN, | ) | Chapter  7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| DELUXE MOTOR COMPANY INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No.  10-2015 |
| | ) | |
| DEWEY FRANKLIN HARDMAN and | ) | |
| LORI LYNN HARDMAN, | ) | |
| | ) | |
| Defendants. | ) | |

FILED

3:02 pm, 10/28/11

Tim J. Ellis
Clerk of Court

## OPINION ON COMPLAINT

On September 19, 2011, this adversary proceeding came before the court for trial on the Complaint to Determine Non-Dischargeability of Debt under Section 523(a)(6) Willful and Malicious Injury, filed by Deluxe Motor Company Inc. ("Deluxe") and the answer filed by Dewey and Lori Hardman. The plaintiff was represented by Phillip Willoughby. The defendants were represented by Stephen Winship.

This adversary was initiated against both debtors in this case. At the trial, the court granted the defendants' motion to dismiss as against Mrs. Lori Lynn Hardman and entered its Order on September 28, 2011. This Opinion and accompanying Judgment is applicable only to Mr. Hardman ("Hardman"). The court considered the testimony and other evidence, the arguments of the parties and applicable law, and is prepared to rule.

**Jurisdiction**

The court has jurisdiction over this complaint under 28 U.S.C. §§ 157(a) and 1334(a). This is a core proceeding under §157(b)(2)(I). The complaint is brought under 11 U.S.C. § 523(a)(6).[1]

**Findings of Fact**

Mr. Hardman and his spouse, Lori Hardman ("Debtors"), filed for Chapter 7 bankruptcy protection on April 8, 2010. The Debtors listed Deluxe Harley Davidson on their Schedule F as a creditor holding an unsecured nonpriority claim in an "unknown" dollar amount. Deluxe filed this adversary proceeding on June 20, 2010. The Debtors filed their Answer on August 16, 2010.

Charles Ruiz ("Ruiz"), is a stockholder[2] and president of Deluxe. In 1992, he opened Deluxe as an exclusive Harley Davidson motorcycle ("Harley Davidson") dealership in Casper, Wyoming. Later, he opened a satellite store in Gillette, Wyoming and also began selling Buell motorcycles. Mr. Ruiz is a master technician, overlooks the service department and assists Mrs. Ruiz with the bookkeeping duties of the business. He generally oversees everything to do with the business and, in his words, "was the ultimate authority."

---

[1] Unless otherwise indicated, all future statutory references are to the Bankruptcy Code, Title 11 of the United States Code.

[2] Mr. Ruiz owns fifty percent of Deluxe's stock. Mrs. Maria Ruiz, his spouse, owns the other fifty percent.

Mr. Hardman owned and operated his own motorcycle shop, Cycle Zone, prior to being hired by Deluxe. He also worked as a consultant to Deluxe before being employed as the sales manager. According to Ruiz's testimony, Hardman was hired because of his motorcycle sales experience. Throughout Hardman's employment at Deluxe, Ruiz and Hardman considered each other as trusted friends, traveled and raced motorcycles together.

In 2003, shortly after Hardman began working for Deluxe, the parties entered into an agreement whereas Deluxe would begin taking metric motorcycles[3] ("Motorcycles") as a trade-in toward the purchase of a Harley Davidson. The Motorcycles would then be consigned to Cycle Zone to sell. Prior to this arrangement, Deluxe would not accept a Motorcycle as a trade-in for the purchase of a Harley Davidson. All the Motorcycles went to Cycle Zone to be sold, except for the few that Ruiz kept for personal use. Mr. Ruiz testified that the arrangement was initiated with the hopes that it would increase sales at Deluxe. The agreement regarding the consignments, its procedures and payments was verbal and never reduced to writing.

Mr. Ruiz testified that when a Motorcycle was taken in as a trade-in, a file was established for that Motorcycle to include all documents, including the title, at Deluxe.

---

[3] As Deluxe is an exclusive Harley Davidson dealership and also sold Buell motorcycles, the court understands that the parties' references to "metrics," "metric bikes," "metric motorcycles," to mean any type of motorcycle other than a Harley Davidson. The testimony presented that Cycle Zone did not sell any Harley Davidsons, with the exception of one that may have been offered through Cycle Zone's Douglas, Wyoming location. For the sake of clarity, the consigned motorcycles will be identified as "Motorcycles" throughout this opinion.

The Motorcycle was delivered to Cycle Zone. As Cycle Zone sold the Motorcycle, it was to pay Deluxe the amount allowed as trade-in and receive the title to transfer ownership of the Motorcycle to the buyer. Deluxe would: (1) be paid the amount that the Motorcycle was allowed at trade-in; (2) pay Cycle Zone for any repairs or maintenance required on the Motorcycle to prepare it for sale;[4] and, (3) proceeds received from the sale price over and above the above costs, were to be divided equally (50/50) between Cycle Zone and Deluxe.

Mr. Ruiz testified that at some point, Hardman took the Motorcycles' titles, without his knowledge, from the files at Deluxe. In some files, instead of leaving the title, Hardman executed a consignment agreement and placed that in the file. Mr. Ruiz alleges that because Hardman was in charge, as sales manager, he did what he wanted and took the titles without authorization. Upon the sale of a Motorcycle, the proceeds were deposited into Cycle Zone's account, then Cycle Zone would pay Deluxe. According to Ruiz, the payments from Cycle Zone, for the sale of the Motorcycles, came at irregular intervals. Mr. Ruiz did not know how many Motorcycles were consigned to Cycle Zone over the years that the arrangement was in place.

Mr. Hardman testified that during 2006, he was managing the two locations for Deluxe, Cycle Zone and then opened a second Cycle Zone location in Douglas,

---

[4] Cycle Zone did not present any repair or maintenance bills to Deluxe for work performed on the Motorcycles.

Wyoming. His job duties at Deluxe were often more than just a sales manager. He testified that, although he did not have the title, he performed the duties of a general manager. He had authority to sign checks for payroll and UPS deliveries. Mr. Ruiz was responsible for the accounting, so he did not input sales or pay bills. Mr. Ruiz was servicing the Harley Davidsons and "doing whatever was necessary to stay in compliance with the Harley Davidson guidelines." Mr. Hardman and Ruiz talked on the telephone on a daily basis to discuss business.

In operating Cycle Zone, Hardman did the bookkeeping using a basic accounting program. He briefly used H&R Block to prepare federal tax returns. Later, he prepared Cycle Zone's tax returns.

At Deluxe, a monthly inventory report was generated on the Harley Davidson inventory. However, the Motorcycles were not inventoried. Mr. Hardman testified that the accounting procedures at Deluxe were "very poor." Throughout the years he worked for Deluxe, there were numerous accountants retained. Its system did not have the ability to charge or send out statements. There was not any monitoring of the consigned Motorcycles until March 2006, when Deluxe upgraded its accounting system. At that time, because the new system did not have the capabilities needed to inventory the Motorcycles, each was shown as sold to Cycle Zone, taken out of inventory and put in Deluxe's system as a receivable.

Mr. Hardman agreed that the initial procedure that was established for the sale of

Case 10-02015 Doc 39 Filed 10/28/11 Entered 10/28/11 15:05:28 Desc Main
Document Page 6 of 11

a consigned Motorcycle included: Cycle Zone would sell a Motorcycle, pay Deluxe for the amount of the trade-in, and then receive the title. However, he testified that the procedure did not work "in the real world." Motorcycles would arrive at Cycle Zone with the titles. Motorcycles were delivered to Cycle Zone from Casper and/or Gillette without his knowledge. Cycle Zone also took consignments from others. Those sale proceeds were not segregated from the proceeds of Deluxe Motorcycles. Mr. Hardman admitted that Cycle Zone did not pay Deluxe for the sale of Motorcycles on a regular basis. He testified that, "when he had time, he would do it." Over the course of the seven years, Cycle Zone sold approximately 150 Motorcycles on consignment from Deluxe for the amount of "roughly $550,000.00."

Mr. Hardman testified that he had found a buyer for Cycle Zone. To conclude the sale, Cycle Zone had to account for its inventory. Part of the inventory included Motorcycles on consignment from Deluxe. Cycle Zone, after negotiations with Deluxe, purchased the inventory of Motorcycles for the amount of $185,068.80. Mr. Hardman sent the check, along with his resignation letter to Deluxe on August 25, 2009. Mr. Ruiz testified that he cashed the check on the advice of his attorney, although he did not want to. On October 21, 2009, Ruiz sent a letter to Hardman listing several additional Motorcycles that were not listed in the settlement listing. Mr. Hardman mailed his response and included checks to pay for two Motorcycles that "fell through the cracks" on December 2, 2009.

Mr. Hardman's letter closed with the following statement,

"I did state in my resignation letter (copy enclosed) that if there were any issues to let me know as soon as possible. It took you two months to get back to me with those issues...I am also a very busy person and do not have any people to help me do the research. It will take some time. You will be paid for everything that is owed to Deluxe Harley Davidson..."

At trial, Mr. Ruiz presented evidence of Deluxe bills of sale, Deluxe invoices, Cycle Zone's sales slips and Department of Transportation certificate of title information for 13 Deluxe Motorcycles that were consigned to Cycle Zone. Mr. Ruiz alleges that Hardman sold the Motorcycles and converted the money to his own use. Based upon the amount of trade in and the proceeds received by Cycle Zone upon the sale of the Motorcycle, Deluxe alleges that the total amount of funds converted is $79,477.76. Deluxe argues that Hardman should not be allowed to discharge this debt in his Chapter 7 bankruptcy case.

**Discussion**

The Bankruptcy Code provides that debts resulting from a willful and malicious injury by the debtor to another entity or to the property of another entity are not dischargeable.[5] A creditor has the burden to prove by a preponderance of the evidence that a debt is nondischargeable.[6]

To be nondischargeable, a debt must be for willful and malicious injury. Negligent or reckless acts do not suffice to establish that a resulting injury is wilful and

---

[5] § 523(a)(6).

[6] *In re Pasek*, 983 F.2d 1524 (10th Cir. 1993).

Page 7

malicious.[7] Willful and malicious injury occurs when a debtor, without justification or excuse and with full knowledge of the specific consequences of his conduct, acts notwithstanding, knowing full well that his conduct will cause particularized injury. Such a standard is consistent with the rule that § 523(a)(6) requires not only intentional conduct on the part of the debtor, but also intentional or deliberate injury.[8]

The test of dischargeability in the Tenth Circuit still requires proof of deliberate and intentional injury. However, the court also recognizes that secured creditors are not restricted to direct evidence of specific intent to injury in satisfying the requirements of §523(a)(6). The requisite malicious intent may be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. The debtor's actual knowledge or the reasonable foreseeability that his conduct will result in injury to the creditor, are highly relevant.[9]

Evidence of the debtor's motives, including any claim justification or excuse, must be examined to determine whether the requisite "malice" in addition to "willfulness" is present. One without the other will not suffice to bar a discharge under §523(a)(6). All the surrounding circumstances are relevant to determine whether the debtor acted with a culpable state of mind resulting in the actual injury. Thus, the

---

[7] *Kawaauhau, et vir v. Geiger*, 523 U.S. 57 (1998).

[8] *Pasek* at 1527.

[9] *Supra.*

conversion of another property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury is a willful and malicious injury within the meaning of the exception to discharge.[10] The word "willful" in § 523(a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury not merely a deliberate or intentional act that leads to injury.[11] Section 523 requires willful and malicious injury by the debtor, which is interpreted to mean that the debtor must intend that the conversion of the collateral injury the creditor.[12] A willful act is one in which the debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it. The elements of malice are that a malicious injury occurs when there is proof that the debtor either intended the resulting injury or intentionally took action that was substantially certain to cause the injury. This is a subjective test. The court must determine what the debtor knew or intended with respect to the consequences of his actions.[13]

In order for Deluxe to prevail under the §523(a)(6) exception, it must establish that when Hardman did not pay Deluxe upon the sale of the Motorcycles, it intended to injure Deluxe. The court, reviewing the personal and professional relationship between Ruiz and Hardman, notes that the parties were intricately involved. The gentlemen

---

[10] *Supra.*

[11] *In re Moore*, 357 F.3d 1125 (10th Cir. 2004).

[12] *In re Daviscourt*, 353 B.R. 674 (10th Cir. B.A.P. 2006).

[13] *In re Schoen*, 407 B.R. 420 (Bankr. D. Okla, 2009).

worked together in Ruiz's business, Deluxe. Hardman maintained his own businesses. Ruiz and Hardman recreated together. The arrangement to sell the Motorcycles through Cycle Zone was mutually beneficial to both businesses. It appears the relationship was sustained for a period of over seven years. Unfortunately, the relationships, professionally and personally, dissolved.

It does not appear to the court that Deluxe, Cycle, Ruiz or Hardman considered the accounting of the Motorcycles as a priority throughout their business relationship. The consignment agreement was loosely arranged. As the Motorcycles were delivered to Cycle Zone, then sold, the funds were deposited and then an accounting and check cut to Deluxe when Hardman had time to deal with it. There was not any testimony presented that Deluxe objected to this procedure until the end of the relationship.

The allegations that thirteen Motorcycles were not paid for by Cycle Zone, was controverted. The court finds credible, Hardman's testimony, that all efforts to identify, located and pay for consigned Motorcycles was made. Deluxe has not produced any evidence to show that Hardman intended, or intentionally took action that was substantially certain to injure Deluxe with his handling of payments for the Motorcycles. The facts indicated that the lack of a formal inventory of the Motorcycles as they left Deluxe and came into the possession of Cycle Zone and accounting were mutually sloppy.

The court finds that Deluxe did not carry its burden of proving, by a preponderance of the evidence, that Hardman willfully and maliciously injured Deluxe. The court will enter a judgment against Deluxe on his §523(a)(6) claim for relief.

DATED this 28 day of October, 2011.

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
Phillip Willoughby
Stephen Winship